**GOLD BOND STAMP COMPANY OF GEORGIA, Plaintiff-Appellee,**

v.

**GILT–EDGE STAMPS, INC. and Sav-A-Stop, Inc., Defendants-Appellants.**

**No. 29333.**

United States Court of Appeals, Fifth Circuit.

Jan. 5, 1971.

Rehearing Denied Feb. 22, 1971.

---

28

George L. Hudspeth, Mahoney, Hadlow, Chambers & Adams, Jacksonville, Fla., for appellants.

Frank X. Friedman, Jr., Jacksonville, Fla., for plaintiff-appellee. Rogers, Towers, Bailey, Jones & Gay, Jacksonville, Fla., of counsel.

Before TUTTLE, DYER and SIMPSON, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal by Gilt-Edge Stamps, Inc., and its affiliated corporation, from a jury verdict and judgment based on what the trial court, by directed verdict, determined to be a breach of a contract by Gilt Edge. The amount found by the jury, and adjudged by the trial court, to be due from Gilt-Edge to Gold Bond represented the last payment agreed to be made by Gilt-Edge result-

ing from a contract entered into several years earlier whereby Gilt-Edge had sold its trading stamp business to Gold Bond. The two companies were both in the business of issuing and redeeming trading stamps. On August 5, 1963, they entered into an agreement under which Gilt-Edge agreed to sell Gold Bond all of its assets, including its trade name, for a purchase price of $540,000. Gilt-Edge undertook to go out of the trading stamp business and Gold Bond undertook either to redeem any outstanding Gilt-Edge stamps or to exchange them for Gold Bond stamps. As a part of the consideration of the contract, Gilt-Edge agreed to pay Gold Bond at the rate of $10 a pad for any Gilt-Edge stamps which Gold Bond might redeem or exchange during the period from the closing of the contract to September 10, 1966. However, the contract contained a provision under which Gilt-Edge's liability to reimburse Gold Bond for such redemptions would terminate before that date if in any three month period the monthly average of stamps redeemed or exchanged by Gold Bond was less than $100.

Because of the significance of the several parts of the critical paragraph we quote here from paragraph 8 of the contract:

"8. The Seller will not issue any trading stamps after the closing, from the closing to September 10, 1966, the Seller will continue to redeem its outstanding stamps in the manner provided in this agreement. Thereafter, the Buyer will at its expense redeem any of the Seller's stamps which may be presented for redemption and it shall indemnify and hold the Seller harmless against any liability or claims which may be made against Seller on account of stamps presented for redemption after that date. The parties contemplate that the Buyer will convert the Seller's licensees from Seller's trading stamp plan to Buyer's trading stamp plan immediately upon completion of the sale, and that Buyer will handle the redemption of Seller's

stamps for merchandise. Buyer will redeem Gilt-Edge trading stamps for merchandise or issue its trading stamps so redeemed or exchanged. The Buyer shall keep a separate account of its redemption and exchange of Seller's stamps. Any of Seller's stamps which are redeemed or exchanged by Buyer shall be cancelled by the Buyer. *At monthly intervals beginning on or about October 1, 1963, and continuing for two consecutive months and thereafter when not less than 2,500 pads of Seller's stamps have been accumulated, the Buyer and the Seller shall jointly count and destroy such stamps at Seller's office in Jacksonville, Florida. The Seller shall thereupon reimburse the Buyer at the rate of $10.00 for each Pad of Seller's redeemed or exchanged stamps so counted.* No such accountings shall be required after September 10, 1966, and in no event shall the Seller be obligated to reimburse the Buyer for stamps redeemed, exchanged, counted or presented to Seller after that date, for purposes of this agreement a 'pad' of Seller's stamps means 5,000 stamps or 4⅙ of Seller's saver books completely filled with stamps. *During the period from the closing to September 10, 1966, the Buyer shall make monthly reports to the Seller of the number of Gilt-Edge Stamps redeemed or exchanged by it during the preceding month.* Notwithstanding anything to the contrary contained herein if at any time during such period the monthly average of stamps redeemed or exchanged during any period of three consecutive months is less than $100.00, the Seller's liability to redeem stamps shall terminate at the end of such three-month period and thereafter the Buyer will at its expense redeem any of Seller's stamps which may be presented for redemption, and it shall indemnify, and hold the Seller harmless against any claims which may be made against Seller on account of stamps presented for redemption after that date." (Emphasis added.)

It will be noted that while Gilt-Edge agreed to reimburse Gold Bond at the rate of $10.00 for each pad of sellers redeemed or exchanged stamps, this requirement was to be accomplished in the manner set out in paragraph 8 above and as emphasized, that is that "at monthly intervals beginning on or about October 1, 1963, and continuing for two consecutive months and thereafter *when not less than 2500 pads of seller's stamps have been accumulated,* the buyer and the seller shall jointly count and destroy such stamps at seller's office in Jacksonville, Florida." The provision further stated that the seller should thereupon reimburse the buyer at the rate of $10.00 for each pad of seller's redeemed or exchanged stamps, "so counted." (Emphasis added.) Furthermore, the same paragraph of the contract provided: "During the period from the closing to September 10, 1966, the buyer shall make monthly reports to the seller of the number of Gilt-Edge stamps redeemed or exchanged by it during the preceding months." There then follows the provision that if at any time during such period "the monthly average of stamps redeemed or exchanged during any period of three consecutive months is less than $100.00," Gilt-Edge's liability to redeem stamps should terminate at the end of such three month period. Thereafter Gold Bond would be responsible for continuing to redeem Gilt-Edge stamps but would not be entitled for reimbursement.

Both parties both at the trial court and here agree that this contract is clear, plain and unambiguous. This being so, it was the duty of the trial court to undertake to construe it, if possible, within the four corners of the document. At the very least, it seems that the parties contemplated that before Gilt-Edge was required to redeem any stamps, it was entitled to have for the first several months a monthly delivery of redeemed stamps by Gold Bond at Gilt Edge's office in Jacksonville, and thereafter whenever as many as 2500 pads of seller's stamps had been accumu-

lated, to have Gold Bond deliver the stamps at Gilt-Edge's office in Jacksonville, where they would be counted and redeemed. In the meantime, in view of the fact that it might take more than a single month to acquire the 2500 pads that was the unit of redemption, Gilt-Edge was entitled to have a monthly report made by Gold Bond of the actual number of stamps that it had redeemed during the preceding months. Thus, although it might take three or four months to acquire 2500 pads to be delivered in Jacksonville, Gilt-Edge would be made aware of the fact that Gold Bond had been accumulating the number of pads reported in the monthly report.

As to the redeemed stamps for which Gold Bond claims the right to require Gilt-Edge to make reimbursement in this suit, Gold Bond complied with neither of its obligations. The facts which are relatively undisputed with respect to these matters may be briefly stated. Between the closing of the sale on August 31, 1963 through October 23, 1964, Gold Bond submitted stamps having a value under the contract of approximately $434,000.00. So far as record references in the briefs of the parties disclose the facts, it does not ap-

pear whether this sum was redeemed strictly in accordance with the requirement of the contract providing that upon accumulation of 2500 books the stamps should be delivered to Jacksonville and then redeemed. Nevertheless, it is not disputed in the record that not a single time during that period was a monthly report required by paragraph 8 made by Gold Bond to Gilt-Edge in spite of the fact that Gilt-Edge made at least nineteen telephone calls requesting the reports. Following the redemption of stamps received from Gold Bond on October 23, 1964, there appears to have been no submission of stamps for redemption for nearly two years, when Gold Bond attempted to ship what it claimed amounted to $28,146 worth of additional stamps for reimbursement. Prior to this time, on March 3, 1965, Gilt-Edge wrote a letter, calling attention to the fact that no monthly reports had been made and no stamps had been presented for redemption for more than four months and that Gilt-Edge therefore considered its obligation to redeem had terminated on January 23, 1965, three months after the last tender of stamps for redemption.[1]

---

1. This letter, which by pretrial stipulation was conceded had been received by Gold Bond, although the Vice President having to do with the handling of the matter testified that he had not seen it was as follows:

"Dear Mr. Tilleskjor:

"As you know, we represent Gilt-Edge Stamps, Inc. This letter refers to the agreement dated August 5, 1963, between Gilt-Edge Stamps and Gold Bond Stamps Company of Georgia.

"In paragraph 8 of the agreement, Gilt-Edge agreed to continue to redeem its trading stamps until September 10, 1966, or until * any earlier three-months period during which the monthly average of stamps redeemed by Gilt-Edge was less than $100.00.

"In the same paragraph of the agreement, Gold Bond agreed to make a report to Gilt-Edge each month of the number of stamps redeemed during the preceding month. Although Gilt-Edge requested reports from you on a number of occasions, only one report dated October 13, 1964, was ever received.

"The last stamps which Gold Bond presented to Gilt-Edge for redemption were received by Gilt-Edge on October 23, 1964. More than four months have elapsed since that date and no more stamps have been presented to Gilt-Edge for redemption. No reports have been made to Gilt-Edge that any stamps were redeemed by you since October 23, 1964.

"The three months period specified in Paragraph 8 expired January 23, 1965, three months after the last stamps were presented to Gilt-Edge. Therefore, the obligation of Gilt-Edge to continue to redeem its stamps terminated on January 23, 1965.

"This letter is to put you on notice of the termination of Gilt-Edge's obligation and to call upon you to indemnify and hold Gilt-Edge harmless against any claims which may be made against it on account of stamps presented for redemption after January 23, 1965.

Very truly yours,
/s/ W. H. Adams, Jr."

When Gold Bond thereafter in June of 1966 submitted some $28,000.00 worth of bonds for redemption (it is to be noted that the term of the contract requiring the submission of the bonds when they reached 25,000 books had not been precisely complied with in this instance), counsel for Gilt-Edge wrote a letter refusing payment, citing the earlier letter of March 3, 1965 as the basis for such refusal.

It is thus clear that within the first few months after the closing of the agreement a very substantial number of Gilt-Edge stamps were redeemed by Gold Bond, and these, totaling $434,-000.00 in value, were redeemed, notwithstanding the failure of Gold Bond to furnish the monthly statements required under Section 8 of the contract. Thereafter, redemptions obviously were much slower, and because, according to the testimony of Gold Bond officials, they did not think the monthly reporting was necessary, they set up no procedure whereby it could be complied with, and they simply waited for nearly two years before they sent in the accumulation of the months following the October 13, 1964 redemption shipment. They then bundled up all the Gilt-Edge stamps they had redeemed in the intervening period and shipped them to Gilt-Edge with a demand for payment, to be met with the refusal, on the grounds that in the absence of the monthly reports Gilt-Edge was entitled to assume that during the three month period following the last redemptions the average monthly redemptions had fallen before the $100 mark, thus terminating their obligation under the terms of the contract. At the trial, Gilt-Edge strongly urged that the furnishing of the monthly statements is a condition precedent to their obligation to pay, stating that their failure to insist upon payment of the very substantial amount in the earlier months of the contract did not amount to a waiver of their right to demand strict performance after the flow of redemptions slowed down materially. Gilt-Edge has not here argued that the failure of Gold Bond to follow the requirements of the paragraph 8 that immediately upon receipt of 2500 pads they had to be submitted to them for redemption constituted a breach. In fact, the total finally shipped to them slightly exceeded the total of 2,500 pads.

Gold Bond, the plaintiff in the trial court, contended that the utterly cavalier fashion with which they treated the requirements of the monthly reporting should be ignored by the trial court since, as Gold Bond contended, this was an independent covenant undertaken by Gold Bond and not in any way a condition to the performance by Gilt-Edge of its agreement to redeem the stamps. Gilt-Edge countered by undertaking to tender oral testimony to prove that the parties intended for the agreement for making monthly reports to be a dependent rather than an independent term of the contract. The trial court excluded all such evidence on the ground that it would tend to vary the terms of the written contract, which both parties then, and now, agree to be unambiguous.

Thereupon, the defendants, Gilt-Edge, undertook to prove the materiality of the term of the contract requiring the monthly reports. This testimony, however, was also excluded by the trial court on the theory that in light of its holding that this was an independent covenant, the only remedy available to Gilt-Edge for its breach, was a compulsory counter claim, which Gilt-Edge had not filed in the case. The trial court thus held that in the then posture of the case, which could not then be remedied, the complete failure of Gold Bond to comply with this term of the agreement was to be totally disregarded by ccurt and jury in determining the liability of Gilt-Edge to pay for the last batch of redeemed Gilt-Edge stamps.

We are thus conformed with the need to determine whether the trial court correctly construed the undertaking by Gold Bond, as a part of the section 8 of the contract, to "make monthly reports to the earlier of the number of Gilt-Edge

stamps redeemed or exchanged by it during the preceding months," as an independent agreement, not going to the real consideration of the contract, and not in any way a condition to the performance by Gilt-Edge of its obligations, or not even a requirement that Gold Bond must perform to demonstrate that it had not reached a period of three months during which there were average redemptions of less than $100 per month.

The resolution of the right of this case is made difficult by two outstanding facts. The first is the utter, complete, inexcusable failure of the purchaser, Gold Bond, to comply with its understandably beneficial agreement to furnish a monthly report of the number of Gilt-Edge stamps it had redeemed, at a time when it proceeded on the assumption that the only notice that it ever had to give to Gilt-Edge was after it had accumulated 2500 pads of stamps, whereupon it would ship them to Jacksonville and obtain its money. So far as appears in this record, such period of time may have been two, three or four months, with no indication to Gilt-Edge of the demand that might be made on it at some future date. (This, in fact, is what actually happened when Gold Bond permitted some twenty months to elapse between demands being made for reimbursement, with not a single monthly, or any other kind of, report of redemptions being made by it, for which it would ultimately seek reimbursement.) The other fact is that other than the difficulty of Gilt-Edge's being able to anticipate its outstanding liabilities and its likely requirements to reimburse Gold Bond, and the difficulty of knowing when, in fact, the flow of redemptions might drop below the $100 per month mark for a period of three months, within the contractual period, it is difficult to see what substantial injury resulted from the failure by Gold Bond to live up to its agreement.

Perhaps the parties have directed too much attention to the question of "dependent" versus "independent" as delineating the rights of the parties to the litigation. Nevertheless, since that is the basis on which the trial court took from the jury any issue of the right of Gilt-Edge to refuse to make the payment, otherwise clearly proved to be due, amounting to some $29,000, we look to the Florida cases to determine this issue. The appellant cites Walker v. Close, 98 Fla. 1103, 125 So. 521, where at page 526, the Florida Supreme Court wrote:

"This court has long since committed itself * * * to the principle followed by nearly all the courts that: 'covenants are always considered dependent unless the contrary contention appears. The correct rule upon the subject is, we think * * * that in contracts of this description, the undertakings of the respective parties are always considered dependent unless a contrary intention appears."

On the other hand, the appellee relies upon the case of Steak House v. Barnett, 65 So.2d 736, at page 737 (Fla.Sup.Ct. 1953) where the court said:

"A covenant is independent where it does not go to the whole consideration of the contract but is only subordinate and incidental to the main purpose, and the breach of such a covenant will not ordinarily constitute a sufficient reason for rescission. * * * A covenant is dependent where it goes to the whole consideration of the contract; where it is such an essential part of the bargain that the failure of it must be considered as destroying the entire contract; or where it is such an indispensable part of what both parties intended that the contract would not have been made without the covenant omitted. * * * A breach of such a covenant amounts to a breach of the entire contract."

We have also read Zambetti v. Commodore's Land Co., 102 Fla. 586, 136 So. 644 (1931) in which the court found that a contract for the purchase of land over a three year period required performance even though the seller breached its obligation to pave and ex-

tend the water main within a two month period.

It is apparent from the reading of these and other Florida cases that the courts of that state are concerned with the ability of a defendant who raises the defense of the breach of the covenant by the other party to be able to obtain the value of what he has lost by a separate recovery for damages. For instance, in Zambetti, supra, the court speaks of the kind of a contract where a breach "may be compensated in damages and will not defeat the purpose of the contract." Again, in Steak House v. Barnett, supra, the case cited by the appellee, the definition relied upon by appellee speaks of the breach of an independent covenant as one which "gives to the injured party the right to sue at law for damages." No court seems to have held that where a term has been formally written into the contract embodying a specific undertaking by one party, to be done concurrently during the entire performance by the other party, it may simply be ignored or overlooked by being denominated "an independent covenant."

We conclude, therefore, that the provision requiring the monthly report was not an independent covenant, because we cannot say that upon construing the contract as a whole the parties would have entered into it if it had not included the monthly reporting provision. For us to so hold would amount to a rewriting of the contract by the parties, which we are not at liberty to do.

On the other hand, we do not have here the typical case in which a party seeks to rescind an entire contract because of the breach of a dependent covenant by the other party. What we have is a situation in which a purchaser, Gold Bond, has paid over one half million dollars for the purchase of the Gilt-Edge business, under terms where Gilt-Edge agrees to reimburse Gold Bond for any of Gilt-Edge's outstanding stamps, and then upon the failure of Gold Bond to make monthly reports after the contract has been very largely (in amounts involved) completed, relying upon the failure of Gold Bond to carry out a dependent agreement, i.e., the furnishing of a monthly report, to refuse to pay the final amount that, without substantial dispute, would clearly be due regardless of whether the monthly reports have been filed.

Under these circumstances, we are required to look to the materiality of the breach by Gold Bond.

The trial court declined to permit testimony to go to the jury with respect of the materiality of the failure by Gold Bond to make the monthly reports. It did so on the theory that the only remedy available to Gilt-Edge was a compulsory counterclaim, which the parties conceded could not be made. Nevertheless, the trial court permitted a proffer of evidence by Gilt-Edge as to its claim for injuries sustained as a result of the failure of Gold Bond to make the monthly reports. To begin with, it must be recognized that Gilt-Edge repeatedly asserted that no damages measured in money were sustained. The contention was simply that certain information that Gilt-Edge would otherwise have received would have been beneficial to it in its accounting and in knowing how its cash flow could be computed, and the like. The trial court did permit evidence to the effect that, notwithstanding repeated requests by Gilt-Edge for the making of monthly reports, the latter actually paid out some $435,000 without the making of a single report by Gold Bond. The record also discloses that Gilt-Edge has the right under the contract to require Gold Bond to submit redeemed stamps to it whenever they accumulated to the extent of 2500 pads. At no time did Gilt-Edge invoke this provision of the contract, and it does not complain that the accumulation beyond the 2,500 pad level is a basis for defending against the action.

It appears to us, that the concession by Gilt-Edge that its injury cannot be measured in dollars, taken in connection with its own appraisal of the worth of the promise by Gold Bond to make monthly reports, together with the 2500

pad requirement, demonstrates the correctness of the trial court's determination that there was no issue of fact to present to the jury other than the issue that was finally presented, to wit, the number of pads that were to be redeemed by Gilt-Edge under the contract. Otherwise, the jury would have been called upon without the slightest benefit of even a dollar estimate, to decide whether to award damages in the amount that was clearly due under Gilt-Edge's obligation or to deny recovery completely because of what we find to be a clear but non-material breach of the contract by Gold Bond. We are aware of no Florida case that permits Gilt-Edge to retain all of the benefits of the contract but then rely upon such a minimal, though clear, breach as is here involved to relieve it from carrying out such a material obligation on its part.

The judgment of the trial court is affirmed.